William T. Walsh
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
(212) 969-3908
wwalsh@proskauer.com

*Additional Counsel listed on Signature Page*
*Attorneys for RWJ Barnabas Health, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RWJ Barnabas Health, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>NJMHMC, LLC d/b/a Hudson Regional Hospital; 29 E 29th Street Holdings, LLC; NJBMCH, Inc.; Bayonne Medical Center Opco, LLC; Hudson Regional Management, LLC; Hudson Regional Hospitals, LLC,<br><br>Defendants | Jury Trial Demanded<br><br>***PUBLIC REDACTED VERSION*** |

## COMPLAINT[1]

1.     This Complaint challenges HRH's and the CarePoint Litigation Trust's coordinated scheme to convert CarePoint's collapse into unlawful gain.   HRH

---

[1] Unless otherwise noted, all emphasis added, internal citations and quotation marks omitted, and capitalizations conformed without brackets.

conspired first with CarePoint's Landlord, then with CarePoint itself, and now with the Litigation Trust, to seize control of the CarePoint Hospitals, and to weaponize CarePoint's assigned claims so that it can unjustly enrich itself and entrench its monopoly power over emergency services in the City of Bayonne.

2.      In 2019, HRH saw an opportunity to seize control of Bayonne Medical Center, one of three distressed hospitals that made up the CarePoint Health System. CarePoint was collapsing under the weight of more than a decade of corporate looting by its prior owners – the "Founders" – who, as CarePoint later admitted, engaged in a "***systematic siphoning of [CarePoint's] assets for over a decade***," totaling over $1 billion, which "rendered the [hospitals] insolvent, left them with insufficient capital, and *weakened* them to the point they became virtually *unviable as going concerns*."

3.      Where others saw dying embers, HRH saw a diamond in the rough— Bayonne dominated the market for emergency care in the City of Bayonne and exploiting that position promised immense profit once freed from the shackles of Founder debt.

4.      HRH soon discovered, however, that CarePoint did not actually own the hospital.  Bayonne was not a single, unified institution, but – like a jigsaw puzzle – was an interlocking web of corporate and real estate interests owned by competing

factions.  The land, buildings, and facilities belonged to the landlord, Avery Eisenreich, while CarePoint merely controlled the operating company.

5.    Caught between these dueling owners, HRH sided with Eisenreich, Bayonne's landlord.  That alliance – forged amid the chaos of CarePoint's financial collapse – would later be branded by CarePoint as a "conspiracy" between HRH and Eisenreich to drive CarePoint into bankruptcy and acquire its operating assets debt free and on the cheap.

6.    HRH ultimately prevailed.  It acquired the Bayonne property from Eisenreich, enforced the lease terms to the letter, and forced CarePoint – not just Bayonne, but the *entire system* – into bankruptcy.  But that victory was neither immediate nor cheap.  It took more than five years and cost HRH over $270 million to achieve.

7.    During this period, HRH had CarePoint on the ropes, but CarePoint did not go down without a fight.  As its finances deteriorated under the weight of the Founders' billion-dollar cash extraction scheme and new legislation enacted specifically to curb CarePoint's abusive billing practices, CarePoint turned to its favorite weapon of choice:  litigation.  It countersued HRH, accusing HRH and Eisenreich of conspiring to drive it into bankruptcy.  That countersuit delayed HRH's takeover of the hospital for several years, but it was not enough to generate real competition for CarePoint's assets.

8.    CarePoint needed another bidder, so it turned to Barnabas.  Barnabas had previously expressed interest, but – as with the HRH negotiations – CarePoint could not bring its landlord, Avery Eisenreich, to the table.  To force Barnabas to re-engage, CarePoint resorted again to its favorite tactic: another lawsuit.  This time, CarePoint imagined a bigger conspiracy.  It was no longer HRH and Eisenreich who orchestrated CarePoint's descent into bankruptcy, as previously alleged; now, it was Barnabas who supposedly masterminded it.  In its complaint against Barnabas, HRH and Eisenreich were recast as mere puppets, with HRH merely "*involved* with Eisenreich in efforts to advance ***RWJ's*** goals, including controlling the real estate under the Hospitals [and] decimating CarePoint."

9.    CarePoint knew this imaginary conspiracy was a sham.  Within days of filing, it was forced by the Governor of New Jersey to retract many of its central allegations, ***publicly admitting they were "baseless and without merit."***

10.    Yet, CarePoint pressed ahead, demanding that Barnabas participate in mediation, framing the lawsuit as an opportunity to acquire its hospitals and thereby "resolve" the suit.  As CarePoint wrote only months after filing:

> "Because of the pending litigation …, RWJ Barnabas has a unique opportunity to enter into some arrangement or transaction with CarePoint.  CarePoint is willing to end the litigation in connection with any business arrangement with RWJ."

Barnabas refused to capitulate.  But the Court-ordered mediation had served its purpose—it created the appearance of a stalking horse and drew HRH to the table.

11.    CarePoint then succeeded in turning HRH from adversary to ally, joining forces in their own conspiracy against their common rival, Barnabas.

12.    In late 2024, HRH and CarePoint struck a new bargain. After years trying to stave off bankruptcy, CarePoint made an abrupt U-turn, embracing the process to its own advantage. Through a series of transactions prior to, but culminating in, a pre-packaged bankruptcy plan, CarePoint transferred control of its hospitals to HRH in exchange for the creation of massive new debt—obligations that HRH then used to settle CarePoint's conspiracy claims against it and to acquire CarePoint's remaining claims against Barnabas.

13.    This collusive conduct between HRH and CarePoint had a singular purpose: to enable HRH to recoup from Barnabas the $270 million it had spent executing its takeover scheme. The deal transformed HRH – the very party accused of conspiring with Barnabas – into both a settling defendant and the controlling beneficiary of those same allegations, giving it consent powers over all future litigation decisions and entitling it to the lion's share of any recovery.

14.    HRH embraced its new role with a vengeance. Upon the effective date of the CarePoint Litigation Trust on May 22, 2025, HRH deposited $3.5 million into a litigation fund and directed the Trust to continue prosecuting the claims against Barnabas. With HRH's consent and complete control, the Trust pressed forward,

continuing to assert allegations HRH and the Trust knew – with absolute certainty and beyond a shadow of a doubt – were false, including the following:

- "RWJ's conspirators have included real estate players Avery Eisenreich … and Yan Moshe **[HRH]**."

- "RWJ and its conspirators including ... HRH, …, Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County Community."

- "HRH and its principals … were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."

- "RWJ colluded with others including Moshe, HRH and Eisenreich in effort to close down Bayonne Medical."

- "Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint."

- "HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County."

- "The plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close."

- "Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical…."

- "RWJ and its conspirators including … HRH, Moshe, [and] Kifaieh have engaged in underhanded, self-serving, anti-competitive and

improper actions for their own benefit and to damage CarePoint and the public."

- "RWJ's conspirators in this effort [to monopolize, attempt to monopolize, or conspire to monopolize the market for GAC services in Hudson County] include ... HRH, Moshe, and Kifaieh."[2]

15.    Each of these allegations cast HRH as a central participant in a supposed conspiracy with Barnabas—a conspiracy HRH knows never existed. What began as a figment of CarePoint's imagination has now been ratified by HRH and the Trust. That is sham litigation. HRH cannot hide behind "information and belief" pleading standards when the allegations concern *its own conduct*.

16.    Nor was HRH required to permit these fraudulent allegations to persist. The Bankruptcy Court gave HRH the right to do the right thing. It was given **sole** authority – and the responsibility – to stop the Trust's assertion of these knowingly false allegations. Instead, HRH compelled the Trust to do the opposite: to abandon its duty of candor to the Court in an effort to offset the $270 million HRH spent to secure control of the hospitals.

17.    Even apart from the false allegations, HRH has perverted the legal process to its own ends, seeking to unjustly enrich itself at Barnabas's expense. Either the heart of the case – the conspiracy allegation – is false, in which case HRH and the Trust are perpetrating a fraud on the Court, *or* those allegations are true, in

---

[2] TAC ¶¶ 8, 19 & n. 2, 21, 115, 116, 149, 183, & p. 34

which case HRH would be capitalizing on its own wrongdoing. It cannot have it both ways. But in either event, HRH's direct or indirect recovery constitutes unjust enrichment. As a wrongdoer, HRH cannot collect from its alleged co-conspirators the costs it incurred in carrying out the wrongful scheme.

18.    HRH's misconduct, however, extends even further. It is using this lawsuit not just to extract money from Barbabas, but to eliminate competition in the City of Bayonne for emergency services. Barnabas is the only meaningful constraint on HRH's exercise of monopoly power, through its satellite emergency department ("SED") operating in Bayonne. But because HRH has no claim against Barnabas, it used its dominion over the Trust to force the Trust to do its bidding. The Trust – a non-operating entity whose sole purpose is to monetize CarePoint's *past* damages claims – has no cognizable interest in the future competitive dynamics of the City of Bayonne Emergency Services Market. Only HRH has that interest. HRH's use of this lawsuit, in concert with the Trust, constitutes a conspiracy in restraint of trade, unlawful monopolization, attempted monopolization, and conspiracy to monopolize in violation of the Sherman Act.

19.    Through its complaint, Barnabas seeks to put a stop to HRH's misuse of the judicial process, prevent HRH from profiting from its own wrongdoing, and restore fair competition in the City of Bayonne Emergency Services Market. HRH's conduct – its conspiracy with Eisenreich, its conspiracy with CarePoint, its

acquisition and misuse of CarePoint's claims against Barnabas, and its conspiracy with (and control over) the Trust – violates the most basic principles of equity, the integrity of the courts, and the nation's antitrust laws. Unless enjoined, HRH will continue to exploit the Trust to enrich itself at Barnabas's expense, suppress competition, and harm the patients and community who depend on lawful and accessible emergency medical care in Bayonne.

## THE PARTIES

20.    **Barnabas**.  Plaintiff RWJ Barnabas Health, Inc. is a not-for-profit health system organized under New Jersey law with its principal place of business in West Orange, New Jersey.  Barnabas operates a state-approved Satellite Emergency Department ("SED") in the City of Bayonne.

21.    **HRH.**  HRH refers collectively to the defendant HRH entities: NJMHMC, LLC; NJBMCH, Inc.; 29 E 29 Street Holdings, LLC; Bayonne Medical Center Opco, LLC; Hudson Regional Management, LLC; and Hudson Regional Hospitals, LLC.  Each of these individually named Defendant entities is part of a comprehensive corporate structure that controls and operates 80% of the hospitals located in Hudson County, New Jersey, including Bayonne Medical Center, which for a substantial portion of the relevant period was the sole provider of emergency medical services in Bayonne, New Jersey.  HRH's component entities are all affiliates of one another, and coordinated and operated as a unified whole in pursuit

of the anticompetitive conspiracy such that they can reasonably be referenced as a unified whole.

22.    **NJMHMC, LLC.**  Defendant NJMHMC, LLC, doing business as Hudson Regional Hospital, is a New Jersey limited liability company with its principal place of business located at 55 Meadowlands Parkway, Secaucus, New Jersey.   NJMHMC, LLC is the licensee and operator of Hudson Regional Hospital and is the primary business entity through which the HRH organization transacts business in the marketplace.

23.    **NJBMCH, Inc.**  Defendant NJBMCH, Inc. is an HRH-owned and -controlled New Jersey corporation with its principal place of business located in Secaucus, New Jersey.  NJBMCH, Inc. is a holding company created by Mr. Yan Moshe, to receive the assets and perform the services identified in the January 2024 Term Sheet executed with CarePoint relating to HRH's acquisition of CarePoint's Bayonne Hospital and control over the entire CarePoint system.

24.    **29 E 29 Street Holdings, LLC.**  Defendant 29 E 29 Street Holdings, LLC, is an HRH-owned and -controlled New Jersey limited liability company with its principal place of business located at 32 Farmstead Lane, Glen Head, New York 11545.  29 E 29 Street Holdings, LLC owns the real estate under the Bayonne Medical Center.

25.    **Bayonne Medical Center Opco, LLC.**  Defendant Bayonne Medical Center Opco, LLC, is an HRH-owned and -controlled New Jersey limited liability company with its principal place of business located in Secaucus, New Jersey. Bayonne Medical Center Opco, LLC functions as the operating company for Bayonne Medical Center and is named as the Debtor-in-Possession Lender to CarePoint under CarePoint's Bankruptcy Plan.

26.    **Hudson Regional Management, LLC.**  Defendant Hudson Regional Management, LLC is a partially HRH-owned and -controlled New Jersey limited liability company.  According to the bankruptcy management services agreement ("MSA"), Hudson Regional Management, LLC is the entity established to provide administrative oversight services to the CarePoint hospitals, and is owned 50%-50% by CarePoint and an entity designated by Yan Moshe.

27.    **Hudson Regional Hospitals, LLC.**  Defendant Hudson Regional Hospitals, LLC, doing business as Bayonne Medical Center, is an HRH-owned and -controlled New Jersey limited liability company.  Hudson Regional Hospitals, LLC is an entity identified in CarePoint's bankruptcy as a party to a Binding Term Sheet with CarePoint Health Systems, Inc. and to the Collateral Surrender and Operations Transfer Agreement in connection with the transfer of Bayonne Medical Center.

28.    HRH is the Trust's primary beneficiary and holds exclusive consent rights over all litigation decisions undertaken by the Trust in this action.  HRH is a

direct assignee, beneficial owner, and real party in interest with respect to the claims asserted by the Trust in this action. HRH also controls, jointly with Dr. Achintya Moulick, the operations of Bayonne Medical Center ("Bayonne"), Hoboken University Medical Center ("Hoboken"), and Christ Hospital ("Christ," and together with Bayonne and Hoboken, the "CarePoint Hospitals") under a Management Services Agreement.

### UNNAMED CO-CONSPIRATORS

29. To carry out their scheme, the Defendants conspired with several other persons and entities, each an unnamed co-conspirator.

30. **Defendants' Affiliates, Employees, and Consultants**. Each Defendant conspired with its affiliates, employees, and consultants to bring about the actions alleged herein. While all such affiliates, employees, and consultants are not separately named as Defendants, they participated in unlawful acts in furtherance of the alleged conspiracy.

31. **The Trust**. The CarePoint Litigation Trust (the "Trust") is a trust created in connection with CarePoint's Bankruptcy Plan. The CarePoint Litigation Trust became effective on May 22, 2025, and was substituted as plaintiff in this action by Court Order dated July 23, 2025. ECF 238 at 1; ECF 260[3]. Nominally organized to hold and prosecute litigation claims for the benefit of CarePoint's

---

[3] All ECF references are to Case No. 22-cv-05421 (D.N.J), unless otherwise indicated.

creditors, the Trust is controlled by HRH. Its Trustee, Paul Navid, serves subject to HRH's exclusive consent and veto rights.

32. **CarePoint**. CarePoint, also referred to as the CarePoint debtors, consists (or consisted at relevant times) of numerous affiliated entities, including CarePoint Health Systems, Inc.; IJKG, LLC; IJKG OPCO, LLC; Hudson Hospital Opco LLC; and HUMC Opco LLC; as well as their parents, subsidiaries, affiliates, employees, advisors, and consultants. Such entities and persons participated in the conspiracy alleged herein.

33. **Avery Eisenreich**. Avery Eisenreich, including through the entities he directly or indirectly controls, and employees or consultants of such entities, participated in the conspiracy alleged herein. Such entities and persons controlled directly or indirectly by Mr. Eisenreich include Alaris Health; WTFK Bayonne Propco LLC; SB Holdings, LLC; SB Hoboken Propco, LLC; and David Sussman.

34. **Individual Co-Conspirators**. Individual co-conspirators, acting either in their personal capacity or as employees, officers, or directors of Defendants or unnamed co-conspirators include HRH's Owner and Chairman Yan Moshe, CarePoint's Founders Vivek Garipalli, James Lawler, and Jeffrey Mandler (together, the "Founders"); CarePoint's consultant Lou Modugno; and former CarePoint President and Chief Executive Officer Dr. Achintya Moulick. Such persons participated in the conspiracy alleged herein.

13

## JURISDICTION AND VENUE

35.    This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Barnabas asserts claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

36.    The Court has supplemental jurisdiction over Barnabas's state law claim against the Trust under 28 U.S.C. § 1367(a), and Federal Rule of Civil Procedure 13(a), because this claim arises out of the same nucleus of operative facts and form part of the same controversy as (i) Barnabas's federal claims against the Trust; and (ii) the Trust's affirmative claims against Barnabas.

37.    The Court has supplemental jurisdiction over Barnabas's state law claim against HRH under 28 U.S.C. § 1367(a), and Federal Rule of Civil Procedure 14(a), because this claim arises out of the same nucleus of operative facts and form the same controversy as Barnabas's federal claims against HRH, and because HRH is or may be liable to Barnabas for all or part of the Trust's affirmative claims against Barnabas.

38.    The Court has personal jurisdiction over HRH pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, based on HRH's nationwide contacts.  The Court can also assert general personal jurisdiction over HRH because it has its principal place of business in New Jersey.  The Court has specific personal jurisdiction over HRH because the claims arise in whole or in part out of transactions and tortious

conduct in which HRH engaged in this District and that were expressly aimed at, and caused injury in, New Jersey.

39.    Venue is proper under 28 U.S.C. § 1391, 15 U.S.C. § 22, and Federal Rules of Civil Procedure 13 and 14 because a substantial part of the events or omissions giving rise to these claims occurred in this District, and both HRH and the Trust are subject to personal jurisdiction here.  Both HRH and the Trust reside in, transact business in, and can be found in this District, and a substantial portion of their unlawful conduct has been carried out in this District.

## FACTUAL ALLEGATIONS

### A.    *The Birth of CarePoint.*

40.    In 2008, a financial analyst, Vivek Garipalli, together with James Lawler and Jeffrey Mandler acquired Bayonne Medical Center out of bankruptcy.  A few years later, they acquired Hoboken University Medical Center and Christ Hospital, consolidating the three facilities under the CarePoint banner.  Through these acquisitions, the Founders secured control of most inpatient and emergency room services in Hudson County, and crucially, achieved a monopoly over emergency services in the City of Bayonne, where no other emergency facility operated at that time.

41.    From inception, the Founders' goal was to divert hospital revenues for their own personal profit.  To accomplish this, the Founders developed what

CarePoint itself describes as a "byzantine network of shell companies," which they used to extract **over a billion dollars** from the system through self-dealing transactions.[4]  As CarePoint admitted to a federal Bankruptcy Court:

> "After acquiring the Hospitals from prior bankruptcies, the [Founders] proceeded to extract … millions of dollars from the Hospitals through numerous *questionable transactions* and transfers, including without limitation, *sale-leaseback transactions*, *inflated management fees* (for which little or *no services* were provided) paid to related entities, and *diversion of corporate assets to personal use*….
>
> The [Founders] *systematic siphoning of Debtors' assets for over a decade*, among other factors, rendered the Debtors insolvent, left them with insufficient capital, and *weakened* them to the point they became virtually *unviable as going concerns*."[5]

### 1. The Founders Extract Cash Through Sale-and-Leaseback Transactions.

42.    When most people think of a hospital, they picture a building with hospital beds, medical equipment, and staff working seamlessly to treat patients.  But the Founders saw something else:  an opportunity to extract exorbitant sums of cash.  They realized they could separate the CarePoint Hospitals' most valuable assets – the underlying real estate – from their operations and use that division to generate immediate personal profit.

---

[4] *In re CarePoint Health Systems, Inc., et al.*, Case No. 24-bk-12534 (JKS), Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization, Bk. ECF 522 at 35-36, (Jan. 21, 2025 Bankr. D. Del.).

[5] *Id.*

43.    To execute this plan, the Founders divided each of the CarePoint Hospitals into an operating company ("OpCo") and a property-holding company ("PropCo"), all of which rolled up to holding companies initially under the Founders' common control.    The OpCos managed the CarePoint Hospitals' day-to-day operations, while the PropCos owned the underlying real estate, buildings, and facilities.    Once this bifurcated structure was in place, the Founders sold off interests in the hospital real estate to outside investors, extracting **over $100 million** in sale-and-leaseback transactions.    Specifically:

- In February 2011, CarePoint sold 100% of its interest in the Bayonne real estate for $58 million to Medical Properties Trust ("MPT"), a national publicly traded REIT.

- That same year, the Founders sold a 70% interest in the Hoboken real estate to MPT for $50 million.

- In 2012, CarePoint sold 25% of its interest in the Christ real estate to Avery Eisenreich for $10 million.

Through the proceeds from the real estate sales and the receipt of subsequent inflated rental payments under leases for Christ and Hoboken, hundreds of millions of dollars were funneled to Founder-controlled entities for personal or non-hospital purposes.

44.    But these sale-and-leaseback transactions were shortsighted.    Yes, they generated short-term liquidity.    But they permanently stripped the CarePoint Hospitals of their core assets.    As CarePoint would later regrettably acknowledge, these deals gave the new landlords – Avery Eisenreich and MPT – "veto" rights over

any subsequent sale of the CarePoint Hospitals, ensuring the CarePoint Hospitals could never be sold or financed free and clear by CarePoint or the Founders.

### 2.    *The Founders Extract Cash Through Fictitious "Tax Distributions."*

45.    The Founders also funneled millions of dollars out of the CarePoint Hospitals through so-called "tax distributions."  These distributions were labeled as payments to cover tax liabilities supposedly incurred by the Founders as members of the various hospital entities.  In reality, the label "tax distributions" was a pretext to disguise outright withdrawals of hospital cash for personal use.

46.    By mischaracterizing such transfers, the Founders withdrew ***over $200 million dollars*** that should have, and otherwise would have, been reinvested in patient care and hospital operations.  As early as 2015, CarePoint's creditors began challenging these transactions, alleging that the Founders had extracted tens of millions of dollars beyond any legitimate tax exposure, that such distributions "bore no relationship whatsoever to taxes imposed on [the Founders], and served no purpose other than to knowingly and fraudulently deprive" creditors of their rights to hospital-generated revenues.[6]

---

[6] *California Capital Equity, LLC v. IJKG, LLC*, Case No. 652373/2015 (July 2, 2025 N.Y. Sup. Ct.), Complaint ¶ 5.

### 3.    The Founders Extract Cash Through Fraudulent or Inflated Related-Party Transactions.

47.    The Founders also engaged in scores of related-party transactions, including sham transactions, to funnel *additional* funds to Founder-related entities and to shield assets from creditors.  To this end, the Founders created a parallel network of affiliated service and management entities, also owned by the Founders, that entered into no-bid contracts with the CarePoint Hospitals for non-existent or inflated "management" or administrative services.

48.    Chief among these entities were two "management companies," Sequoia Health Management, LLC and IJKG, LLC.  Tellingly, neither entity had any employees, business premises, operating infrastructure, or notable business expenses.  Nor did these companies provide any actual services to the CarePoint Hospitals.  Nevertheless, the Founders caused the CarePoint Hospitals to enter into contracts – in which CarePoint Founder Vivek Garipalli signed on behalf of both parties – obligating Bayonne to transfer 95% of its net profits to IJKG, while Hoboken and Christ would transfer 4% of their gross revenues (before expenses such as band-aids, medicines, salaries, and equipment) to Sequoia.  These arrangements alone siphoned ***more than \$300 million*** from the CarePoint Hospitals to the Founders for fictitious or duplicative services.

49.    To accelerate their burgeoning personal enrichment, the Founders also monetized the *future* revenue streams created through their fraudulent management

services contracts.  In 2014, the Founders directed Sequoia to obtain a **$60 million** loan from Credit Suisse backed by future management fees and guarantees from the hospital OpCos, effectively transforming projected bogus income into a very real, very immediate lump-sum cash payout.  These funds were used for the Founders' personal benefit and/or to finance the Founders' other personal business ventures. The Founders also caused the CarePoint Hospitals to incur more than **$100 million** in other Founder-related debt, through shell companies, such as Maple Healthcare LLC.

50.    The Founders knew that these transactions were fraudulent. █████



Though this particular transaction did not materialize, the Founders used similar tactics to extract all available funds from the CarePoint Hospitals.

51.  The concealment of the flow of funds was an integral part of the Founders' cash extraction scheme.

52.    Beyond these fictious management services contracts, the Founders also directed the CarePoint Hospitals to enter into a patchwork of inflated, related-party transactions – covering everything from billing to housekeeping – with affiliates they secretly owned or controlled.  None of these contracts were subject to competitive bidding or fair market value review.  Collectively, these arrangements

---

[8] The "Nurses' Union" refers to Health Professionals and Allied Employees (HPAE).

diverted an additional ***$400 million*** in hospital funds to the Founders or Founder-related entities.

### B.    *CarePoint Gouges Patients and Payors to Funnel Funds to the Founders.*

53.    For many years, CarePoint funded the extraordinary and exorbitant payments to the Founders by gouging patients and payors.  According to data collected by the Centers for Medicare and Medicaid Services (CMS), CarePoint had some of the highest prices of any hospital in New Jersey and throughout the nation.





Cost of treating chronic obstructive pulmonary disease in 2011 at local hospitals.  Bayonne's prices shown in red.

54.    To charge such exorbitant rates, CarePoint terminated insurer contracts that capped reimbursement rates.  CarePoint recognized that it possessed monopoly power over General Acute Care (GAC) services in Hudson County and, especially, over emergency services in the City of Bayonne as the city's only emergency department prior to Barnabas's entry in 2017.  By terminating its insurer contracts and going out of network, CarePoint was able to unilaterally dictate out-of-pocket prices to patients and payors.

55.    Under the Founders' control, reimbursement rates drastically increased, and the CarePoint Hospitals became some of the most expensive hospitals in the nation, more than premier institutions like the Mayo Clinic.

23

### C.    *The Founders' Scheme Begins to Collapse.*

56.    Monopolies are not everlasting.  Nor are fraudulent schemes.  As the Founders' scheme grew, cracks in the foundation began to appear.

### 1.    *The Founders Starve the Hospitals of Necessary Investment and Resources, Reducing Patient Demand.*

57.    As the Founders extracted unprecedented sums, they starved the hospitals of essential resources.  Expenditures on medical equipment, patient care, and maintenance were slashed.  CarePoint fired or laid off many employees, reduced wages below the prevailing market rates, and cut back on all non-essential expenses.

58.    In several instances, CarePoint stopped paying vendors, including essential chemical and pharmaceutical providers, and even exterminators.  The Founders also closed down specific service lines at the CarePoint Hospitals, including the pediatric unit at Christ.  These reductions maintained the flow of funds to the Founders in the short run, but severely degraded the quality of the CarePoint Hospitals, ultimately driving patients away and irreversibly affecting the long-term viability of the CarePoint system.

### 2.    *The Founders' Extraction of Monopoly Profits Sparks Barnabas's Entry into Bayonne.*

59.    The backlash against CarePoint was severe, particularly from insurers who were legally obligated to pay CarePoint's increasingly unreasonable rates.  As CarePoint explained, its efforts to increase rates "caused a great deal of tension

between Horizon and CarePoint, … [since] Bayonne Medical did not participate in Horizon's network at the time."[9]

60.    At the same time, Barnabas – New Jersey's largest non-profit, charitable hospital system – was looking for ways to reach more patients in need throughout the state.  In 2017, with the support of community leaders, 450 citizen petitioners, insurers, and others, the Department of Health approved Barnabas's application to open a Satellite Emergency Department ("SED") in the City of Bayonne.  As the New Jersey Department of Health stated,

> "The Department has conducted its own analysis … and found that the data … supported [Barnabas's] position that the proposed SED in Bayonne would eliminate or substantially mitigate problems of access to appropriate emergency care in Bayonne….
>
> The data showed … that there is, indeed, a problem of access to appropriate emergency care in Bayonne.
>
> The data also showed [that there were thousands of patients] who had healthcare insurance in which Bayonne Medical Center is currently out-of-Network.  [Barnabas] on the other hand … remains in-network for the majority of health insurances plans in the region."

61.    Once the Department of Health approved Barnabas's SED application, patients and payors had a viable choice for emergency care for the first time since the Founders took control of Bayonne in 2008. █████████████████████

███████████████████████████████████████████████

---

[9] TAC ¶ 60.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

### 3. The Legislature Passes the Out of Network Act to Limit CarePoint's Price Gouging.

62.    CarePoint's relentless price gouging also drew the attention of the New Jersey Legislature, culminating in the passage of 2018 Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act (the "Out of Network Act"), N.J. Stat. Ann. §§ 26:2SS-1.  By imposing mandatory arbitration, the Act prevented out-of-network healthcare providers, such as CarePoint, from charging excessive rates for emergency care. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

63.    The Out of Network Act obliterated the Founders' cash extraction scheme because it relied so heavily on this source of income. █████████████

████████████████████████████████████████████████

████████████████████████████████████████ After the Out of Network Act, Christ had to close many departments, █████████████

████████████████████████████████████████████████

███████████████████████████████████

██████

     ***4.***     ***The SCI Investigates CarePoint's Fraudulent Misuse of Corporate Assets for Personal Gain.***

64.    Around the same time, the New Jersey State Commission of Investigation (SCI) opened a fraud investigation targeting CarePoint and the Founders specifically.

65.    The SCI is a government investigative agency tasked with rooting out organized crime. Ultimately, the SCI found that the Founders had siphoned off at least $157 million in questionable payments in just four years. As the SCI found, Christ paid management fees to Sequoia that were nearly 460% greater than its net operating income. The Founders also extracted over $98 million from Bayonne. These amounts dwarfed the hospitals' own operating margins and brought "into question [the hospitals'] long-term financial viability."

66.    To resolve the SCI investigation, the Founders agreed to terminate their sham management contracts. But this was for appearances' sake only. The Founders had come to rely on the money they siphoned from the CarePoint Hospitals and needed that revenue stream to continue to fund their debt obligations, other business ventures, and lavish personal lifestyles. To replace the bogus management fees, the Founders increased their bogus "tax distributions." ████████████████████

██████

███████████████████████████████████████

67.     The other Founders agreed.    ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████    Despite the SCI's findings, the Founders

continued to extract over ██████████████████████████

███    even as CarePoint laid off employees and informed the Department of Health

that closure of Christ Hospital was imminent.

> **D.     The Founders Initiate a Sales Process to Extract the Last Pennies from the CarePoint System Before Off-Loading Its Distressed Assets.**
>
> > **1.     The Founders' Attempt to Conceal the CarePoint Hospitals' Distress.**

68.     By late 2018, the CarePoint Hospitals were hemorrhaging cash.  The

Founders' cash-extraction schemes had left the institutions overleveraged,

undercapitalized, and unable to attract outside investment.  Each facility was ████

███████████████████████████████████████

██████████████████████████

69.    In response, the Founders mobilized a crisis task force of executives, investment bankers, lawyers, and consultants to orchestrate the Founders' hasty exit. This task force publicly presented the Founders' exit plan as an effort to "preserve access to care." ████████████████████████████████████

████████████████████████████████████████████

70.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

71.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

72.    The marketing materials prepared by CarePoint's investment bankers also contained numerous material misstatements and omissions. ████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

73.    At the same time, lenders were ████████████████████████

████████████████████████████████████ forcing CarePoint

to seek additional loans to fund payroll, send layoff notices, close patient care

departments, and prepare to put one or more of the hospitals into bankruptcy.

### 2.    The Proposed Sale of Hoboken and Bayonne to Atlantic Falls Through Over a Dispute with MPT of Land Valuation.

74.    Despite casting a wide net for potential buyers, there was limited

interest.    Only two serious bidders emerged—Barnabas and Atlantic Health.

Barnabas submitted its draft non-binding Letter of Intent on July 3, 2019, and

Atlantic followed in early August 2019.

75.    Neither Barnabas nor Atlantic, however, was interested in buying the

entire CarePoint system.    Barnabas wanted to acquire Hoboken and Christ, viewing

them as potential complements to its existing facility in Jersey City.    Conversely,

Atlantic was interested in Hoboken and Bayonne, but believed Christ was too far

gone to be salvaged.

76.    Initially, the Founders celebrated having two competitive bids,

believing that the exclusivity of each (both wanted Hoboken) might drive up the

price.    But in reality, it meant that any sale would entail closing at least one hospital,

a prospect that would have dissipated the value (if any) of the closing hospital, invited public and regulatory backlash, and caused any remaining value of the system to evaporate. The Founders initially chose to focus on the Atlantic bid, reasoning that Bayonne's monopoly power over emergency services made it more valuable than Christ.

77.    By late August 2019, the Founders had rejected Barnabas's offer to acquire Hoboken and Christ. But in late September, the Atlantic bid ran into trouble. CarePoint could not sell the entirety of Bayonne and Hoboken; it could only sell its interest in the operating companies. Because CarePoint sold the real estate under those two hospitals to MPT through prior sale-and-leaseback transactions, it could not deliver the hospitals free and clear. This created a divergence of interest – and ultimate stalemate – between CarePoint and the Founders on one hand, and MPT on the other, as each sought to maximize their own share of the proceeds at the others' expense. By mid-October 2019, the would-be deal with Atlantic collapsed.

### 3.    *The Proposed Sale of Hoboken and Christ to Barnabas Falls Through Due to Founder Greed, Founder Disputes with Eisenreich, and Continued Deterioration of Assets.*

78.    As CarePoint was pursuing the Atlantic negotiations, Eisenreich, as a partial owner of Christ, became increasingly concerned that he would be left out in the cold. Because the Founders also had an interest in trying to find a buyer for Christ, ██████████████████████████████████████████████ On

September 23, 2019, Barnabas submitted a Letter of Intent to acquire the Christ OpCo, contingent on negotiating an acceptable lease.

79.    Eisenreich, however, was concerned that a Christ-only proposal would not be acceptable, and so he developed a plan that would keep all three hospitals open.    On September 22, 2019, Eisenreich texted CarePoint's consultant and confidant, Lou Modugno.    Eisenreich explained to Modugno that he may "have a plan that can work for EVERYONE." ████████████████████████

████████████████████████████████████

██████████████████

80.    ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████ But the more

Garipalli learned more about the plan, the more enamored with it he became.

81.    Under  the  plan, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  ████████████████████

████████████████████████████████████

82.    Because the Founders wanted ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



───────────────────────

█ ██████████████████████████████████████████████████
███████████████████████████████████

███████████████████████████████████████████

████████████████████████████ ■    Despite being aware of these

conversations, at no time did CarePoint tell MPT or Barnabas that they were

precluded from discussing a potential transaction with Eisenreich.  Nor could they,

as any such instructions would constitute unlawful tortious interference with

Eisenreich's prospective business relationships.

83.    By the end of October and into early November, Eisenreich and the

Founders had completed step one of their plan: ██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

84.    ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

_____

■███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████████

████████████

85.    Angry at Eisenreich, the Founders attempted to obstruct further negotiations with Barnabas over the lease.  Eisenreich then countered with exorbitant rent demands that made the deal economically infeasible for Barnabas. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████  ██████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

86.    Rather than reduce their demands, however, the Founders ratcheted them up.  In March 2020, Barnabas submitted a revised offer of $185 million for the Hoboken and Christ OpCos and the related real estate.  This was ***higher*** than the amount it had previously offered in the LOI both parties signed in October 2019. Garipalli, however, rejected this offer.  Garipalli now demanded that Barnabas "get the total purchase price up to $230 million ([up] from the initially offered $185

---

█ ████████████████████████████████████████████████████████
████████████████████████████████████████████████████

million),” an increase of nearly 25% over Barnabas's already-improved offer. Barnabas rejected CarePoint's demands.

> **E.  HRH Enters into Several Conspiracies to Drive CarePoint into Bankruptcy and Recoup its Costs.**
>
> > **1.  HRH Conspires with Avery Eisenreich to Drive CarePoint into Bankruptcy.**

87.    In November 2019, HRH became interested in acquiring Bayonne Medical Center. ████████████████████████████████████████████ ████████████████████████████████ Then, in January 2020, HRH "approached CarePoint about a possible acquisition of all or part of … CarePoint."

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

88.    CarePoint viewed HRH as an ideal partner for a quick deal given HRH's CEO, Nizar Kifaieh, was a CarePoint insider and former CarePoint executive. ██████████████████████████████████████████

████████████████████████████████████████████████████

89.    Almost immediately, however, the discussions broke down over the allocation of the purchase price between the OpCo and the PropCo. The Founders believed they could use their political clout – and their threat of imminent closure of

the hospital – to force Eisenreich to sell the real estate for well below its fair market value.  Eisenreich, on the other hand, believed that the hospital operations were near insolvent, and that the hospital's only truly valuable asset was the building and associated real estate.  His demands reflected his estimation of value.

90.    By March 2020, the dispute among the Founders and Eisenreich came to a head, with HRH stuck in the middle.  On March 11, 2020, the Founders rejected any transaction that would not personally benefit them to the tune of tens of millions of dollars. █████████████████████████████████████████

███████████████████████████████████████████████████████

███████  Because paying the Founders for the fraudulent debt Bayonne had incurred over the years would have reduced the amount of money available to acquire the real estate, a three-party transaction between HRH, the Founders, and Eisenreich did not work.

91.    Two weeks later, on March 23, 2020, the Founders took the next step in their plan to force Eisenreich to sell the Bayonne real estate for below market value.  They entered into a Letter of Intent with a newly-created entity, BMC Hospital, LLC, to acquire the Bayonne OpCo.  The Founders knew that this was not a bona fide offer because it was contingent on a hypothetical world in which the government strips Eisenreich of his property interest without fair compensation. █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ ▪

92.    With the BMC LOI in hand, the Founders engaged in an intense lobbying effort to secure support for their plan, in which they threatened closure of Bayonne if it were not accepted.  On May 14, 2020, the Hudson County Board adopted three resolutions authorizing the Hudson County Improvement Authority to condemn the Christ, Bayonne, and Hoboken Properties "in accordance with and in the manner provided by the Eminent Domain Act."

93.    HRH and Eisenreich did not take the Founders' plan sitting down.  They responded with a deal of their own.  On the same day as the Condemnation Resolutions, ████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

94.    Meanwhile, BMC LLC and CarePoint executed an Asset Purchase Agreement on June 1, 2020, and submitted the sale the next day to the NJDOH for approval.

_____

▪ ████████████████████████████████████████████████

██████████████████████████████████████████

95.    Immediately after the BMC agreement was announced, HRH announced it had agreed to acquire both the Bayonne and Hoboken real estate from Eisenreich for $220 million, $76 million of which was allocated to Bayonne, ███ ████████████████████████████████████████████ Eisenreich and HRH then acted in concert to issue notices of default and institute eviction proceedings against CarePoint.

96.    On August 10, 2020, HRH, through its controlled affiliate, 29 E 29 Street Holdings, LLC, acquired the real property under BMC from Eisenreich, and became the successor in interest to Eisenreich's rights under the lease.

97.    In response to these eviction proceedings, CarePoint countersued.  On June 4, 2020, CarePoint filed suit in the Superior Court of New Jersey against HRH.[14]  CarePoint accused HRH of "conspiring with Avery Eisenreich" to "thwart" the sale of the "Hoboken and Christ Hospitals to RWJ Barnabas" and to sell Bayonne Medical to BMC Hospital LLC." ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

---

[14] *IJKG Opco, LLC v. NJMHMC LLC, et al.,* HUD-C-000087-20 (Jun. 4, 2020 Super. Ct. N.J.), ¶¶ 6, 154.

98.    Ultimately, HRH spent over $270 million to force CarePoint into bankruptcy in its effort to take control of the Bayonne hospital.

### F.    CarePoint Uses Litigation to Try to Force Potential Bidders to Acquire CarePoint.

99.    By mid-2022, CarePoint was still hemorrhaging cash, and remained unable to find a willing buyer for any of the three hospitals.  At that point, the Founders decided to wash their hands of CarePoint.  They recognized that the operating companies were no longer able to pay their debts, let alone funnel money to them for their personal use.  Because the CarePoint Hospitals were insolvent, the Founders decided to "donate" their interests in the CarePoint operating companies by converting them to a new non-profit entity, CarePoint Health Systems, Inc.

100.    The Founders believed that they would personally benefit from the conversion to a non-profit in two ways.  *First*, they intended to take a tax deduction based on an inflated value of the CarePoint entities.  Since the hospitals were insolvent, the Founders' equity had no value (as the subsequent bankruptcy would prove).  Thus, any tax deduction for the donation was, or would have been, fraudulent.[15]  *Second*, prior to the bankruptcy, the Founders had loaded the operating companies with over $100 million in founder-related debt.  The Founders maintained

---

[15] The Founders, despite being compelled to do so (ECF 221), refused to produce their tax returns in this litigation, so the amount, if any, of the actual tax deduction is unknown at this point.

their claims to recover such funds, despite the new non-profit status of the operating companies.

101.   The conversion to a non-profit would benefit the CarePoint Hospitals because the state would step in to provide tens of millions of dollars in stop-gap funding to prevent their closing.  Nonetheless, such funds were a temporary band-aid at best.  CarePoint's new leadership, helmed by CEO Achintya Moulick, decided that the best way to sell the hospitals was to use the courts as leverage.

102.   Pursuant to this plan, CarePoint, under the direct leadership of Moulick, sued *Barnabas* and used the suit against it to extract a settlement in which HRH would become the *de facto* successor-in-interest to CarePoint.

### 1.   The Barnabas Litigation.[16]

103.   By late 2022, any hope of a transaction with a third-party purchaser for the CarePoint Hospitals had vanished.  The only party CarePoint believed could be brought back to the table was Barnabas, but it needed a way to force Barnabas to acquire the defunct hospitals notwithstanding Eisenreich's and HRH's property interests.  Its solution was to assert frivolous litigation against Barnabas, accusing it of conspiring with Eisenreich and HRH.

104.   CarePoint hoped that the lawsuit would ultimately force Barnabas to acquire the CarePoint Hospitals.  As its counsel wrote on February 8, 2024,

---

[16] *The CarePoint Litigation Trust v. RWJ Barnabas Health, Inc.,* 22-cv-05421 (Sep. 6, 2022 D.N.J.)

"CarePoint… will shortly be soliciting the interest of other New Jersey nonprofit health systems in a merger with CarePoint to strengthen CarePoint's presence as the leading provider of acute hospital care in Hudson County.

**Because of the pending litigation** …, RWJ Barnabas has a unique opportunity to enter into some arrangement or transaction with CarePoint. **CarePoint is willing to end the litigation in connection with any business arrangement** with RWJ which results in the continuation of patient care at the CarePoint hospitals."[17]

105.    The lawsuit CarePoint asserted against Barnabas contained knowingly false allegations.  Within days of filing the lawsuit, CarePoint was forced to retract significant portions of its claims.  As CarePoint's CEO Dr. Moulick explained at the time, such allegations were "baseless and without merit."[18]

106.    Even aside from the withdrawn allegations, the Complaint *still* contained materially false allegations.  In particular, CarePoint alleged – for the first time – that Barnabas masterminded the conspiracy between Eisenreich and HRH to interfere with the Founders' sales process and drive CarePoint into bankruptcy.  Specifically, as it relates to HRH, CarePoint alleged that:

- "RWJ's conspirators have included real estate players Avery Eisenreich … and Yan Moshe."

---

[17] The email referenced in this paragraph is not covered by any settlement privilege. Fed. R. Evid. 408 does not apply because the email is not being used to prove or disprove the validity of any claim, and the parties specifically exempted any communications prior to February 9, 2024, including this email, from their March 1, 2024 mediation stipulation.

[18] David Wildstein, *Hospital boss apologizes to Murphy, staff for 'baseless' statements*, NEW JERSEY GLOBE, June 14, 2023 (accessed Nov. 2, 2025).

- "RWJ and its conspirators including ... HRH, …, Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County Community."

- "HRH and its principals … were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."

- "RWJ colluded with others including Moshe, HRH and Eisenreich in an effort to close down Bayonne Medical."

- "Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint."

- "HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County."

- "[T]he plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close."

- "Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical…."

- "RWJ and its conspirators including … HRH, Moshe, and Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public."

- "RWJ's conspirators in this effort [to monopolize, attempt to monopolize, or conspire to monopolize the market for GAC services in Hudson County] include … HRH, Moshe, and Kifaieh."[19]

107.    CarePoint knew that these allegations were baseless and without merit. The CarePoint Complaint alleged no facts concerning Barnabas's alleged role in any conspiracy between Eisenreich and HRH.  Moreover, in CarePoint's previous telling of its conspiracy theory involving Eisenreich, MPT, and HRH, CarePoint alleged that Barnabas was the *victim* of the alleged conspiracy—not a *perpetrator* of it. Indeed, the basis for its prior suits was that Barnabas had acted in good faith, but that Eisenreich and MPT had tried to interfere with the Barnabas transaction for Christ and Hoboken.

108.    HRH and the Trust it controls know with absolute certainty and beyond a shadow of a doubt that each of the allegations set forth in the operative CarePoint Complaint concerning a purported conspiracy between HRH and Barnabas is false.

## 2.    *HRH Conspires with CarePoint to Settle CarePoint's Claims Against HRH and Prosecute CarePoint's Claims Against Barnabas.*

109.    As for the instant litigation, HRH has conspired with CarePoint to take advantage of CarePoint's allegations against Barnabas in an effort to recoup the costs associated with (i) HRH's years-long scheme to drive CarePoint into bankruptcy;

---

[19] TAC ¶¶ 8, 19 & n.2, 21, 115-16, 149, 182-83, & at 34.

(ii) the settlement of CarePoint's claims against HRH; and (iii) HRH's successful bid for control of the CarePoint Hospitals and their underlying real estate.

110.   The various lawsuits that began in mid-2020 between CarePoint and HRH continued for several years.  As part of Dr. Moulick's plan to use litigation to force a third party into a strategic alliance, CarePoint decided to use its claims against HRH to effectuate a *de facto* sale of the CarePoint Hospitals to HRH.

111.   Between November 2023 and January 2024, the respective principals of CarePoint and HRH – including Dr. Moulick and Yan Moshe – engaged in multiple negotiations regarding a "global resolution and combination of their health care resources."[20]   CarePoint and HRH then entered into one or more contracts, combinations, or conspiracies to settle the claims between them, including CarePoint's conspiracy claims against HRH.

112.   Following extensive negotiations, HRH and CarePoint entered into a "Binding Term Sheet" on January 11, 2024.

113.   HRH and CarePoint agreed to resolve the claims each had against the other and to create a four-hospital health network comprised of Hudson Regional Hospital, Bayonne Medical Center, Christ Hospital, and Hoboken University Medical Center.

---

[20] *HRH v. CarePoint Health Sys., Inc.*, HUD-L-001995-24 (May 28, 2024 N.J. Sup. Ct.), Verified Complaint ¶ 39.

114.   HRH and CarePoint also agreed to form a new, jointly-owned and operated management company that would "coordinate patient services and [serve] management functions" for the four-hospital health system.

115.   Under the Term Sheet, CarePoint would control Christ Hospital and Hoboken University Medical Center, and HRH would control Hudson Regional Hospital and Bayonne Medical Center.  As HRH put it in a subsequent lawsuit against CarePoint, it would gain "complete ownership and control" of BMC.  HRH also had the exclusive option to purchase Christ and HUMC.

116.   On January 12, 2024, HRH and CarePoint issued a joint press release announcing the creation of the Hudson Health System.

117.   Under the agreed-upon plan, CarePoint and HRH entered into a management agreement that gave HRH and CarePoint's current CEO joint control over the CarePoint Hospitals, with all economic value going to HRH.  CarePoint also agreed to release HRH from liability for its conspiracy with Eisenreich, and to give HRH control of – and priority interest in – CarePoint's lawsuit against Barnabas, which was premised on an allegation that HRH itself conspired with Barnabas to drive CarePoint into bankruptcy.  For its part, HRH would pay CarePoint an additional $50 million.  The parties agreed that the plan would be documented in several agreements and ultimately form the basis of a pre-packaged Bankruptcy Plan.

118.   As CarePoint put it, before filing for bankruptcy, CarePoint had "spent many months negotiating a comprehensive solution" with HRH, and "the purpose of the[] bankruptcy cases is to implement this solution…."  This included "three comprehensive agreements with certain affiliates of Hudson Regional Hospital…."  One of these, entered into on October 9, 2024, was to "immediately implement [a] Collateral Surrender Agreement allowing [HRH] to operate" Bayonne Hospital.  The agreement for HRH to take over Bayonne was now all but *fait accompli*.

119.   CarePoint's final Chapter 11 Plan Disclosure noted that, once confirmed, "the assets of Bayonne … shall be transferred to HRH…," "and HRH shall be granted the right to operate and manage Christ Hospital and HUMC as set forth in and pursuant to the Hospital Facilities MSA."

120.   As part of the confirmed Bankruptcy Plan, CarePoint settled its claims against HRH, releasing it from all claims "whether known or unknown … arising from, in whole or in part, ... the transactions or events giving rise to[] any Claim or Interest that is treated in the Plan [or] the business or contractual arrangements between [CarePoint] and [HRH]."  This broad release covered HRH's role in the alleged conspiracy with Eisenreich to drive CarePoint into bankruptcy, as well as its role in the baseless alleged conspiracy with Barnabas.

121.   In exchange for this release and other assets, HRH paid CarePoint over $130 million.  Though the release was not separately valued, the Bankruptcy Court

found that the Release was "essential to [CarePoint's] restructuring efforts" because "HRH would decline to support the Plan … without the inclusion of the …. Releases."[21]

122.   HRH not only secured a release of its own liability, it also acquired a direct interest in the proceeds of CarePoint's lawsuit against Barnabas.  Because the CarePoint Hospitals were insolvent, HRH paid tens of millions of dollars, if not more, for the release and assignment.

123.   Under the Litigation Trust Agreement, which was incorporated into the Bankruptcy Plan, the assigned claims were "a deemed transfer from the Debtors ***to the Beneficiaries,***" including HRH, "followed by a deemed transfer by the Beneficiaries to the Litigation Trust."[22]  As such, the claims first belonged to HRH before being passed on to the Trust "for the purpose of monetizing" the claims.[23] Even if HRH were not the direct assignee of CarePoint's claims, it is certainly the beneficial owner of such claims.

---

[21] *In re CarePoint Health Systems, Inc.*, 24-BK-12534 (Nov. 3, 2024 Bankr. D. Del.), ECF 1154 at 53.

[22] SF ¶ 31 & ECF 247-17 (Litigation Trust Agreement ("LT")), at 2; *see also id*. § 8.1 ("the parties hereto intend that the Beneficiaries of the Litigation Trust be treated as if they had received a distribution of the applicable assets transferred to the Litigation Trust and then contributed such assets to the Litigation Trust.").

[23] *Id*. § 1.1.

124.    Distributions from the Trust to the beneficiaries, including HRH, are governed by the Bankruptcy Plan and the Trust Agreement.  Under these governing documents, HRH is the primary beneficiary, receiving anywhere from 35% to 100% of the proceeds, depending on the ultimate recovery.  Specifically, HRH receives the first $3.5 million (plus interest); the next $15 million is distributed to the remaining general unsecured creditors; HRH receives the next $5 million; and beyond that, HRH receives 35% of any proceeds until it has recouped $110 million of the over $130 million it paid.

125.    As the primary beneficiary, HRH was granted unique supervisory control and exclusive consent rights over the Trust.  Under the Trust Agreement, any ongoing "*decisions* regarding the prosecution … of any Cause of Action … that seeks recovery of or is reasonably valued" at one million dollars (such as ***this lawsuit***), "shall require HRH's consent."  Importantly, no conflict-of-interest or recusal provisions limit HRH's control or restrict any payments to HRH.[24]

126.    HRH's control exceeds that of the Oversight Committee, whose members lack ***any*** voting rights, decision-making authority, or consent rights

---

[24] SF ¶ 46.  The Trust Agreement's conflict recusal procedures only apply to the Oversight Committee.  Because HRH's distribution and consent rights are separate from its role as an *ex officio* member of the Oversight Committee, such rights are not constrained by any conflict-of-interest rules.

concerning the prosecution of the assigned claims.[25]    Rather, the Oversight Committee plays only an advisory role, in which it receives "communications" and consults "with the Litigation Trust." *Id*. But consulting is not voting, consenting, or approving. Only HRH possesses those rights.

127. Under the Trust Agreement, the sole purpose of the Trust is to monetize the litigation claims assigned to it. It does "not have authority to engage in a trade or business and no portions of the Trust Assets shall be used in the conduct of a trade or business." As such, unlike CarePoint or HRH, the Trust does not compete in the alleged relevant market, and does not have any ongoing interest in that market.

### 3.    HRH Conspires with the Trust to Commit Further Overt Acts In Support of its Scheme to Assert False Claims Against Barnabas.

128. On May 22, 2025, the Litigation Trust became effective. Upon the effective date of the Litigation Trust, the Trust and its Trustee, Paul Navid, joined the conspiracy between CarePoint and HRH to use the Barnabas Litigation to recoup HRH's costs in driving CarePoint into bankruptcy, taking over the CarePoint Hospitals, and settling CarePoint's claims against it.

129. On June 11, 2025, with HRH's consent, CarePoint and the Trust moved to substitute the Trust as plaintiff in the Barnabas Litigation. On July 23, 2025, the Court granted the substitution motion. Since that date, the Trust, with HRH's

---

[25] SF ¶¶ 48-50.

consent, has continued to assert knowingly false and baseless allegations against Barnabas. The Trust expressly refused to amend the operative CarePoint Complaint upon its substitution, and thus, has continued to assert that "HRH and its principals . . . were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."[26]

130.   HRH and the Trust know with 100 percent certainty and beyond a shadow of doubt that HRH did not conspire with Barnabas for any reason at any point in time. As such, the Trust's continued assertion of this conspiracy claim – with HRH's consent and at its direction – is both subjectively and objectively baseless.

### 4.   HRH and the Trust Have Conspired to Use this Litigation to Monopolize or Attempt to Monopolize Emergency Care in the City of Bayonne.

131.   In addition to seeking to recoup the costs of its scheme to drive CarePoint into bankruptcy and acquire control of the hospitals, HRH and its co-conspirators seek to use the Barnabas Litigation to eliminate or reduce competition for emergency services in Bayonne.

---

[26] TAC ¶ 19 n.2.

132.   HRH and its co-conspirators possess monopoly power, or have a dangerous probability of obtaining monopoly power, over emergency services provided in the City of Bayonne.

133.   The City of Bayonne Emergency Services Market is a well-defined antitrust market because there are no reasonable economic substitutes for these services, and a hypothetical monopolist of such services could impose at least a small but significant and non-transitory increase price.  Emergency care generally must be provided in close proximity to the scene of the accident or medical emergency.  Because the City of Bayonne is located on a peninsula, transportation to other emergency rooms outside of Bayonne is often not feasible.  Nor are non-emergency services substitutes for emergency services.

134.   During the relevant period, CarePoint and HRH possessed significant monopoly power over Emergency Services in Bayonne.  Prior to the Barnabas SED's entry into the market, Bayonne was the only provider of emergency services in the city, and possessed 100% market share.  Even after the SED's entrance, Bayonne continued to have over 60% of the emergency services market.  CarePoint and HRH's monopoly power is further demonstrated by CarePoint's successful ability to extract exorbitant rates for services when it went out of network with Horizon and other insurers prior to the enactment of the Out of Network Act.  Nor did the Out of Network Act eliminate CarePoint's and HRH's monopoly power.

135.   An alternative market exists for emergency services provided to residents of Bayonne City.  This market includes Bayonne City residents that obtain emergency services at Bayonne Medical Center, SED, and Jersey City Medical Center.  CarePoint/HRH either possesses monopoly power in this market or has a dangerous probability of obtaining monopoly power.

136.   When CarePoint filed suit against Barnabas, it sought injunctive relief. CarePoint has the purpose and specific intent of using the litigation to reduce competition between Barnabas and CarePoint.  When CarePoint's claims against Barnabas were assigned to the Litigation Trust, the Trust continued to press the injunctive relief claims against Barnabas.  The Trust did so even though the Trust does not itself compete in any healthcare market.  Rather, under the Bankruptcy Plan and Trust Agreement, the Trust's only legitimate purpose is to monetize the assigned claims for the benefit of the Trust's beneficiaries.

137.   But only one of the Trust's beneficiaries competes with Barnabas in either the market for inpatient general acute care in Hudson County, or the market for emergency services in the City of Bayonne: HRH.  HRH, which controls the Trust, has required the Trust to continue asserting the injunctive relief claims with the specific intent and sole purpose of limiting or reducing Barnabas's ability to compete in the City of Bayonne Emergency Services Market.

## COUNT I
## UNJUST ENRICHMENT

138.   Barnabas incorporates each and every paragraph of this Complaint as if fully set forth herein.

139.   From at least January 2020 through the confirmation of CarePoint's bankruptcy plan in May 2025, HRH engaged in a deliberate scheme to acquire control over the CarePoint Hospitals and their associated claims for its own enrichment.

140.   As part of that scheme, HRH conspired with Eisenreich to acquire the Bayonne Medical Center real estate, exploit its leverage as landlord to drive CarePoint into bankruptcy, and block any alternative purchasers from acquiring the Bayonne operating company.  HRH's objective was to ensure that it, and not a third-party buyer, would ultimately control CarePoint's hospital assets and operations.

141.   Among the claims CarePoint asserted before bankruptcy were allegations that HRH's conduct – including its collaboration with Eisenreich – tortiously interfered with CarePoint's contractual rights and prospective business opportunities.  CarePoint also alleged that HRH acted in concert with others, including Barnabas, to obstruct the Founders' efforts to sell the hospitals to third parties.

142.    In resolving those allegations, HRH entered into a settlement and release agreement with CarePoint as part of the pre-packaged bankruptcy plan. Under that settlement, HRH:

a.    Obtained a release of all claims CarePoint had asserted against it;

b.    Acquired, by assignment, CarePoint's remaining claims against Barnabas and other alleged conspirators; and

c.    Secured priority rights and *de facto* control over those claims through the CarePoint Litigation Trust created under the plan.

By virtue of that settlement, HRH transformed itself from a named defendant in one lawsuit by CarePoint and an unnamed conspirator in the Barnabas Litigation (both of which arise out of the same nucleus of operative fact) into a plaintiff and/or real party in interest in the Barnabas Litigation.

143.    The assignment of claims constitutes a concrete and valuable benefit to HRH. It made HRH both a direct assignee of the claims and the principal beneficiary of the Trust established to pursue them. HRH funded the Trust, exercises substantial control over the Trust, and stands to receive priority distributions from any proceeds recovered in this action.

144.    The direct or indirect receipt or retention of any such proceeds would be inequitable and unjust.

a.  *First*, HRH's conspiracy with Eisenreich and the further overt acts it engaged in were a material cause of CarePoint's bankruptcy and the injury CarePoint claims to have suffered.  HRH's recovery via its status as a Trust beneficiary is derivative of CarePoint's injury.  It would be unjust to permit HRH to recover for damages of which it was a substantial and material cause.

b.  *Second*, to the extent the conspiracy with Eisenreich was unlawful, recovering for the consequences of such wrongful conduct would be unjust.

c.  *Third*, CarePoint itself alleged that HRH conspired with Barnabas to injure CarePoint.  Under settled principles of equity, an alleged co-conspirator cannot obtain damages from its supposed co-conspirators for the fruits of the alleged scheme.

d.  *Fourth*, HRH extinguished its own liability for its conduct through the release it negotiated.  Permitting HRH to recover damages on the very claims for which it was released would yield a double benefit—freedom from liability *and* profit from the same events.

e.  *Fifth*, HRH is being unjustly enriched through its control over the Trust to the extent the Trust is seeking injunctive relief.  The Trust does not participate in any relevant healthcare market, and has no interest of its

own in obtaining any injunctive relief. HRH is the only Trust beneficiary with any interest in obtaining injunctive relief. It is wrong and unjust to permit HRH to receive the benefits of injunctive relief based on an assignment of CarePoint's claims to the Trust.

145.    HRH's and the Trust's unjust enrichment comes at Barnabas's direct expense. Any funds Barnabas pays by judgment, settlement, or otherwise to resolve CarePoint/the Trust's claims would constitute a direct and foreseeable transfer of value from Barnabas to HRH, rewarding HRH for conduct that equity forbids it to exploit.

146.    HRH's unjust enrichment is independent of the merits of CarePoint's claims against Barnabas, and stems from HRH's own participation in the alleged wrongful conduct, its conspiracy with Eisenreich, CarePoint, the Trust (and the Trustee), and its role in controlling and benefiting from the Trust.

147.    Even absent actual recovery to date, HRH's possession and assertion of the assigned claims (through the Trust) poses a clear and imminent threat of unjust enrichment. Moreover, HRH's and the Trust's assertion of the assigned claims is itself an inequitable act, and imposes immediate harm by forcing Barnabas to expend litigation resources defending against claims advanced for an improper and unjust purpose.

148.   The Barnabas litigation was initiated by CarePoint for an improper purpose—to create leverage over Barnabas to force it into a transaction to acquire one or more of the CarePoint hospitals.

149.   Irrespective of CarePoint's original motive, CarePoint knowingly asserted false allegations against Barnabas, including allegations it later admitted were "baseless and without merit."   The Third Amended Complaint, filed on February 8, 2023, continues to assert knowingly false allegations of material fact. HRH and the Trust have ratified the statements in the Third Amended Complaint either expressly or through conduct, including by continuing to prosecute claims against Barnabas, by refusing to amend the operative complaint, and by referencing the alleged conspiracy in court filings.

150.   HRH entered into a contract, combination, or conspiracy with CarePoint to step into CarePoint's shoes as the plaintiff in CarePoint's suit against Barnabas.  A principal purpose of the agreement between HRH and CarePoint was to give HRH effective control over CarePoint's claim.   HRH entered into this agreement with full knowledge that the operative complaint contained false statements.

151.   HRH and the Trust know with absolute certainty and beyond a shadow of a doubt that HRH did not enter into any conspiracy with Barnabas relating to the sale of the CarePoint hospitals or real estate (or anything else).  Even if HRH and/or

the Trust does not possess this level of certainty, they either knew or should have known that any allegation relating to a conspiracy between HRH and Barnabas was untrue.

152.    HRH and the Trust also know with absolute certainty and beyond a shadow of a doubt that the following allegations in the Third Amended Complaint are false:

- "RWJ's conspirators have included real estate players Avery Eisenreich … and Yan Moshe."

- "RWJ and its conspirators including ... HRH, …, Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County Community."

- "HRH and its principals … were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."

- "RWJ colluded with others including Moshe, HRH and Eisenreich in an effort to close down Bayonne Medical."

- "Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint."

- "HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County."

- "The plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay

closing so that Bayonne Medical would become insolvent and be forced to close."

- "Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical…."

- "RWJ and its conspirators including … HRH, Moshe, Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public."

- "RWJ's conspirators in this effort [to monopolize, attempt to monopolize, or conspire to monopolize the market for GAC services in Hudson County] include … HRH, Moshe, and Kifaieh."[27]

Even if HRH and/or the Trust does not possess this level of certainty, they either knew or should have known that such allegations were untrue.

153. The claims and allegations against Barnabas are both objectively and subjectively baseless. The Third Amended Complaint alleges a single overarching conspiracy or claim to monopolize the GAC market in Hudson County. A principal component of this overarching conspiracy is the false allegations of conspiracy with HRH to interfere with the sale of CarePoint to third parties. The inclusion of these false allegations renders CarePoint's claims and/or allegations objectively and subjectively baseless.

154. HRH knowingly, or with reckless disregard, conspired with the Trust to cause the Trust to continue to assert baseless claims and allegations against Barnabas. The Trust entered into a contract, combination, or conspiracy with HRH

---

[27] TAC ¶¶ 8, 19 & n. 2, 21, 115, 116, 149, 183, & p. 34.

in which the Trust took overt acts in furtherance of the agreement to assert baseless claims and allegations against Barnabas.  At all relevant times, HRH possessed both the power and the duty to prevent the Trust from asserting these baseless claims and allegations against Barnabas, but did not in fact prevent the Trust from asserting them.  With HRH's consent, the Trust refused to amend the operative complaint to remove the baseless and knowingly false allegations and/or to strike the improper request for injunctive relief.

155.   With HRH's consent and at its direction, the Trust is pursuing claims against Barnabas, not to maximize recovery for the benefit of unsecured creditor beneficiaries, but to benefit HRH's competitive position in the market.  The Trust does not have any legitimate basis for seeking injunctive relief and is continuing to seek such relief solely to eliminate competition from Barnabas to the benefit of HRH.

156.   The continued assertion of false claims and allegations against Barnabas has caused and continues to cause substantial harm to Barnabas, including the threat of an unjust monetary recovery against it, the diversion of resources to defend against a sham case, and the impairment of its ability to compete freely in the marketplace.  As a result of Defendants' conduct, Barnabas has suffered and will continue to suffer both monetary injury and irreparable harm unless the Court intervenes to prevent HRH and the Trust from continuing this sham litigation.

157.   The confirmation of the Bankruptcy Plan does not vitiate or immunize HRH's unjust enrichment.  The enrichment arises from conduct and agreements that were never before, and could not have been adjudicated by, the Bankruptcy Court—including HRH's conspiracy with Eisenreich to drive CarePoint into bankruptcy, its pre-petition agreements with CarePoint to settle litigation, its post-confirmation agreements with the Trust, and its decision to continue asserting objectively and subjectively baseless allegations of a conspiracy between HRH and Barnabas.  The Bankruptcy Court did not address – or have occasion to address – the equitable question presented here: whether HRH may, consistent with equity and due process, retain or profit from the assignment of claims arising from its own conduct.  Because Barnabas was not a party to the bankruptcy proceedings, no confirmation order could confer on HRH a right to enrich itself at Barnabas's expense.

158.   Equity and good conscience require that HRH be barred from directly or indirectly receiving or retaining any proceeds or benefits from this action or the direct or indirect assignment of CarePoint's claims.

## COUNT II
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

159.   Barnabas incorporates each and every paragraph of this Complaint as if fully set forth herein.

160.   HRH's and the Trust's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

161. HRH, the CarePoint Litigation Trust, and the CarePoint debtors have entered into one or more contracts, combinations, and conspiracies to restrain trade and suppress competition in the market for emergency medical services in Bayonne, New Jersey. The contracts, combinations, or conspiracies include: (i) a contract, combination, or conspiracy between HRH and CarePoint; (ii) a contract, combination, or conspiracy between HRH, CarePoint, and the Trust (or Trustee); and (iii) a contract, combination or conspiracy between HRH and CarePoint, which the Trust joined upon its formation.

162. These contracts, combinations, or conspiracies are *per se* unlawful, constitute naked restraints under the quick look analysis, and violate the rule of reason.

163. No allegation of market power is required. But to the extent such allegations are required, HRH possesses market power in (i) the market for emergency services provided in the City of Bayonne; and (ii) the market for emergency services provided to residents of the City of Bayonne. HRH has over a 60 percent market share in each of these alleged relevant markets. Barnabas's SED is the sole competitive alternative in each of these markets. In addition to market share, there is direct evidence that HRH possesses market power because prior to the passage of the Out of Network Act it was able to extract pricing far in excess of competitive rates.

164.   The objective of HRH's contracts, combinations, or conspiracies is to restrain trade by eliminating, crippling, limiting, or foreclosing competition from Barnabas's SED; Barnabas's efforts to compete for doctors, nurses, and patients; and to preserve HRH's market power over emergency services in Bayonne.

165.   In furtherance of their conspiracy, HRH and the Trust have engaged in the subjectively and objectively baseless litigation against Barnabas – asserting a "conspiracy" that HRH and the Trust know to be false – solely to burden and deter Barnabas's lawful competition.

166.   HRH and the Trust have also conspired to use the Trust's assignment of CarePoint's damages claim to seek injunctive relief for the sole and exclusive benefit of HRH.  Since the Trust does not participate in any healthcare market – but exists solely to monetize CarePoint's past damages claims – any attempt to seek injunctive relief constitutes sham litigation pursued solely for HRH's benefit.  The corruption of the Trust's purpose is to the detriment of Barnabas and competition in the relevant market.

167.  There is no procompetitive justification for HRH's or the Trust's conduct.  The anticompetitive effects of the conduct outweigh any procompetitive justifications for such conduct, and/or there are less restrictive means for achieving any legitimate benefits of the Trust's or HRH's actions.

168.   HRH's and the Trust's conduct threatens to cause harm to competition, patients, payors, and Barnabas in the alleged relevant market.

169.   HRH's and the Trust's conduct occurred in and affected interstate commerce.

170.   HRH's and the Trust's conduct is not entitled to immunity.  It falls squarely within the "sham litigation" exception because it is both objectively and subjectively baseless – founded on allegations HRH knows to be false – and subjectively intended to interfere with a rival's business rather than to obtain a legitimate judicial outcome.

171.   Barnabas is threatened with substantial, direct, and foreseeable antitrust injury to its business or property caused by HRH's and the Trust's unlawful conduct.

## COUNT III
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT

172.   Barnabas incorporates each and every paragraph of this Complaint as if fully set forth herein.

173.   HRH's and the Trust's conduct constitutes unlawful monopolization, attempted monopolization, and conspiracy to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2.

174.   HRH possesses monopoly power in (i) the market for emergency services provided in the City of Bayonne; and (ii) the market for emergency services provided to residents of the City of Bayonne.  HRH has over a 60 percent market

share in each of these alleged relevant markets. Barnabas's SED is the sole competitive alternative in each of these markets. In addition to market share, there is direct evidence that HRH possesses monopoly power, since prior to the passage of the Out of Network Act, Bayonne was able to extract prices far in excess of competitive rates.

175. To the extent HRH does not already possess monopoly power, it possesses a dangerous probability of obtaining monopoly power, and has acted with specific intent to obtain monopoly power through exclusionary conduct, including through sham litigation, the assertion of false and baseless allegations, and using its control over the Trust to compel it to wrongfully seek injunctive relief for HRH's sole and exclusive benefit and to the detriment of competition.

176. HRH, the CarePoint Litigation Trust, and the CarePoint debtors have conspired to monopolize the market for emergency medical services in Bayonne, New Jersey. The conspiracy includes: (i) a conspiracy between HRH and CarePoint; (ii) a conspiracy between HRH, CarePoint, and the Trust (or Trustee); and (iii) a conspiracy between HRH and CarePoint, which the Trust joined upon its formation.

177. In furtherance of their scheme, HRH and the Trust have engaged in this subjectively and objectively baseless litigation against Barnabas – asserting a "conspiracy" that HRH and the Trust know to be false – solely to burden and deter Barnabas's lawful competition.

178.   HRH and the Trust have also conspired to use the Trust's assignment of CarePoint's damages claim to seek injunctive relief for the sole and exclusive benefit of HRH.  Since the Trust does not participate in any healthcare market – but exists solely to monetize CarePoint's past damages claims – any attempt to seek injunctive relief constitutes sham litigation pursued solely for HRH's benefit.  The corruption of the Trust's purpose is to the detriment of Barnabas and competition in the relevant market.

179.   The objective of HRH's and the Trust's conduct is to exclude, cripple, foreclose, or limit competition from Barnabas's SED; Barnabas's efforts to compete for doctors, nurses, and patients; and to preserve HRH's market power over emergency services in Bayonne.  HRH's conduct and monopoly power is not the result of historic accident, superior business acumen, or chance, but constitutes willful acquisition, maintenance, or enhancement of monopoly power.

180.   There is no procompetitive justification for HRH's or the Trust's conduct.  The anticompetitive effects of the conduct outweigh any procompetitive justifications for such conduct, and/or there are less restrictive means for achieving any legitimate benefits of the Trust's or HRH's actions.

181.   HRH's and the Trust's conduct threaten to cause harm to competition, patients, payors, and Barnabas in the alleged relevant market.

182.   HRH's and the Trust's conduct occurred in and affected interstate commerce.

183.   HRH's and the Trust's conduct is not entitled to immunity.  It falls squarely within the "sham litigation" exception because it is both objectively and subjectively baseless – founded on allegations HRH knows to be false – and subjectively intended to interfere with a rival's business rather than to obtain a legitimate judicial outcome.

184.   Barnabas is threatened with substantial, direct, and foreseeable antitrust injury to its business or property caused by HRH's and the Trust's unlawful conduct.

### JURY DEMAND

Barnabas requests, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury for all claims and issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Barnabas prays that the Court award the following relief:

- Declare and adjudge HRH's and the Trust's conduct unlawful as set forth in each of the above Counts;

- Enjoin HRH and the Trust from continuing to engage in the unlawful conduct set forth in each of the above Counts;

- Award damages, treble damages, and punitive damages to the extent permitted by each of the above Counts;

- Require HRH and the Trust to disgorge and/or provide restitution for the conduct set forth in, and to the extent permitted by, each of the above Counts;

- Award reasonable attorneys' fees and costs of suit to the extent permitted by each of the above Counts; and

- Award such other relief as the Court deems just and proper

Dated: November 14, 2025                Respectfully submitted,

*/s/ William T. Walsh*

William T. Walsh
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000
wwalsh@proskauer.com

*Attorney for Defendant RWJ Barnabas Health, Inc.*